E-FILED on    4/23/07

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| QUEDILLIS RICARDO WALKER, MYRTLE VIVIAN WALKER, and WILLIAM BERKELEY WALKER,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA CLARA, GERALD EGGE, GAIL LEWIS, EARL PENNINGTON, JOHN SCHON, RANDY DANTO, and DOES 1 to 100,<br><br>Defendants. | No. C-04-02211 RMW<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS EARL PENNINGTON'S AND GERALD EGGE'S MOTION FOR SUMMARY JUDGMENT<br><br>[Re Docket Nos. 121, 122] |

Defendants sheriff deputies Earl Pennington ("Pennington") and Gerald Egge ("Egge") move for summary judgment on plaintiffs Quedillas Ricardo Walker's ("Walker"), Myrtle Vivian Walker's, and William Berkeley Walker's (collectively, "plaintiffs") claims pursuant to 42 U.S.C. § 1983 and § 1985, and their state law claims. Walker opposes summary judgment of his § 1983 and § 1985 claims. Plaintiffs did not did file opposition as to their state law claims or Myrtle and Willaim Walker's familial association claims. The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the court GRANTS in part and DENIES in part defendants' motion for summary judgment as follows:

1.  Pennington's motion for summary judgment is DENIED as to Walker's § 1983 claim based on the alleged suppression of facts relating to Bowers's refusal to take a second

        polygraph and GRANTED as to Walker's remaining § 1983 claims against Pennington;

2. Egge's motion for summary judgment is DENIED as to Walker's § 1983 claim predicated upon the alleged suppression of Bowers's letter to Egge and on the alleged suppression of facts relating to Bowers's refusal to take a second polygraph and GRANTED as to Walker's remaining § 1983 claims against Egge;

3. Pennington's and Egge's motion for summary judgment as to Walker's § 1985 claim is GRANTED;

4. Pennington's and Egge's motion for summary judgment as to Walker's Equal Protection Clause claim is GRANTED;

5. Pennington's and Egge's motion for summary judgment as to Myrtle and William Walker's claims is GRANTED; and

6. Pennington's and Egge's motion for summary judgment as to plaintiffs' state law claims is GRANTED.

## I. BACKGROUND

### A. Law Enforcement Investigation

Pennington and Egge were the sheriff deputies assigned to the investigation of the January 10, 1991 murder of Lisa Hopewell ("Hopewell"). Early in the investigation, Pennington received a phone call from a person known as "J.D." According to Pennington, he and Egge met with J.D. and were told to look into "Ricky the mechanic"[1] who was violent and had a violent relationship with Hopewell. Although Pennington kept notes of the meeting with J.D., this piece of information was not included in his written notes. Pennington and Egge then questioned Walker, who was at the time in custody on unrelated charges. Walker admitted he had had a relationship with Hopewell and that the relationship had at times resulted in violence or threats of violence, but he denied any involvement in the murder.

Lab results of fingerprints on the duct tape around Hopewell's head matched those of

---

[1] Walker was also known as "Ricky."

1  Rahsson Bowers ("Bowers").  Bowers sold drugs in the East Palo Alto area, including to Hopewell.
2  Pennington was out of town at the time.  Egge, along with another investigator, Gail Lewis
3  ("Lewis"), arrested Bowers.  When they first questioned Bowers, he denied any involvement.  *See*
4  Aff. of Earl Pennington Supp. Defs.' Mot. Summ. J. ("Pennington Aff."), Ex. F (Bowers Interview-
5  Tape I).  The interview was taped, but the first thirty minutes of the interview was not captured
6  because the recorder was not working.  *Id.*  The taping begins with Egge noting that the recorder was
7  not initially working.  Egge then repeated Bowers's *Miranda* rights and recapped that Bowers was in
8  the process of telling them that he had first met Hopewell when his friend Walker and Hopewell
9  were living together.  *Id.*

10  Egge then confronted Bowers with the fact that his fingerprints had been matched to those on
11  the duct tape on Hopewell.  Egge also stated that he knew more than one person was involved and
12  further suggested that "[t]echnically, I guess, it could be looked at as a capital crime for torture."  *Id.*
13  at 31.  Egge then ended the interview.  In the interim, Lewis began interviewing Bowers, telling him
14  that she did not believe him and that they knew he was involved.  Bowers began to confess and
15  requested a deal.  Lewis told him the best she could do was inform the district attorney he had
16  cooperated.  At some point during Lewis's interview of Bowers, the tape recording had stopped.  It
17  resumed during Bowers's confession to Lewis, beginning with Bowers's explanation that Walker
18  asked Bowers to accompany him to the Cupertino town home where Hopewell was staying.
19  Pennington Aff., Ex. G (Bowers Interview-Tape II) at 1, 5-6.  Bowers stated that "two white guys"
20  met them and were the ones who taped Hopewell, but that he was forced to tear off the duct tape.
21  He also indicated that everyone had gloves on except for him.  Egge then re-entered the interview
22  room, recapped Bowers's confession, and asked Bowers on the record whether anyone had made him
23  any promises in exchange for his confession.  He further asked Bowers whether the confession was
24  made of his own free will and without threats.  Bowers answered that he confessed of his own free
25  will and that no promises had been made to him.

26  Bowers then took a polygraph test, which he failed.  Thereafter, he revised his confession,
27  omitting the "two white guys" and implicating only Walker and himself.  However, he stated that
28  Walker began fighting with Hopewell and forced him (Bowers) to help kill Hopewell.  Bowers also

1  described that Walker and Hopewell had played dominoes, drank champagne, and smoked cocaine,
2  which was consistent with evidence at the crime scene. The police sought to have Bowers take a
3  second polygraph; however, Bowers refused to submit to another polygraph test. This refusal was
4  never disclosed to Walker's counsel.

5  Pennington and Egge then placed Walker under arrest and further questioned him. They also
6  played excerpts of the interview with Bowers. Walker continued to deny any involvement. He
7  claimed that he was smoking cocaine in a hotel with a woman named Jackie Miller ("Miller") at the
8  time of the murder. He also took a polygraph test, which he failed.

9  Pennington and Egge tracked Miller down through her husband, and informed him that they
10  were investigating a murder involving Walker. When first interviewed by the police, Miller denied
11  that anyone spent the night with her. Pennington Aff., Ex. O (Miller Interview) at 3:4-7; 13:18-24.
12  She stated that Walker dropped her off on January 6, 1991, stayed for about two hours, and then left.
13  *Id.* at 12:5-21. Walker also came by in the afternoon or early evening on Tuesday, January 8, and
14  they had dinner together. *Id.* at 16:2-22. He then returned Wednesday to take her home. After
15  police informed her that Walker had named her as his alibi, she again stated Walker had not stayed
16  with her. *Id.* at 27:10-12, 28:6-14, 38:12-20. She also said she did not mind that the police had
17  spoken to her husband first. *Id.* She later changed her testimony at the preliminary hearing, and
18  again at trial, ultimately testifying that Walker was with her from Wednesday through Sunday.

19  Cigarette butts of Newport cigarettes, a brand Walker smoked, were found at the crime
20  scene. However, DNA tests were not able to link or eliminate Walker as a suspect as he was a
21  "nonsecretor."

22  Sarah Dunbar ("Dunbar") was identified as an individual who had had a relationship with
23  both Walker and Hopewell. On July 19, 1991 Pennington briefly interviewed Dunbar. On July 23,
24  1991 Egge[2] accompanied John Schon, the district attorney for the case, to interview Dunbar.
25  Dunbar was in custody at Elmwood Facility on unrelated drug charges. At the time she was
26  awaiting sentencing. Dunbar did not have information about the murder, but was acquainted with

27
28  [2] Egge had been transferred to court services in May 1991, so was no longer assigned to the Hopewell homicide.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS EARL PENNINGTON'S AND GERALD EGGE'S
MOTION FOR SUMMARY JUDGMENT—C-04-02211 RMW
SPT                                                      4

1   both Walker and Hopewell. She testified at the preliminary hearing on August 5, 1991 and on
2   August 7, 1991. On August 9, 1991 her motion for release on her own recognizance was granted
3   without opposition. She testified at the Bowers and Walker trial. After the trial, she testified that
4   she did not recall what was fact or fiction from her prior testimony, but that she was willing at the
5   time to do anything to get out of custody and had assumed Schon was helping her out.

6   On October 29, 1991, just before the trial began, Bowers wrote Egge a letter indicating that
7   Egge had promised to talk to the district attorney and see what he could do, suggesting that Egge had
8   reneged, and reiterating that Egge had indicated the homicide was a capital crime in which Bowers
9   would get the death penalty. Bowers began the letter "I am writing to you this letter from a confused
10  mind and a very disturbed and batterd [sic] heart." Aff. of Aryn Harris Supp. Defs.' Mot. Summ. J.
11  ("Harris Aff."), Ex. K (Bowers Letter). Bowers drew a picture of the grim reaper stating "your soul
12  was sold with a promise of help and a smile but now it's time to pay the piper," and signed the letter
13  in his own blood. *Id.* Egge later testified that he either took the letter to the Sheriff's office and gave
14  it to someone in homicide or placed it into the Hopewell file himself. *Id.*, Ex. A (Egge Depo.) at
15  18:24-20:7. According to Egge, he felt that the letter was of little evidentiary significance. *Id.* at
16  29:7-30:6.

17  **B.    State Court Trial**

18  Bowers and Walker were tried together. The preliminary hearing in Walker's case
19  commenced July 31, 1991 and continued into the early part of August 1991. Dunbar served as a
20  witness at the preliminary hearing. On August 26, 1991 the district attorney's office filed an
21  information charging Walker with murder and use of a deadly and dangerous weapon in the
22  commission and attempted commission of murder.

23  Trial commenced on October 28, 1991. Dunbar testified at trial as a witness for the
24  prosecution. She testified, *inter alia*, that Walker had a violent relationship with Hopewell, Walker
25  had a propensity toward violence, and that Walker had threatened to kill Hopewell during a fight
26  they had about a year prior to Hopewell's murder.

27  In addition, the state informed the court and Walker's counsel near the close of the
28  prosecution's case that it had made a plea deal with Bowers in exchange for his testimony against

1  Walker. Bowers then testified that Walker was the primary aggressor and forced him to participate
2  in killing Hopewell. The state characterized Bowers as a credible witness who "'fessed up" after he
3  failed a polygraph test.
4        On December 10, 1991 a jury found Walker guilty of murder. The court sentenced him to a
5  term of 26 years to life. On June 11, 2003 Walker filed a petition for writ of habeas corpus based
6  upon newly discovered evidence. On June 20, 2003 the state court found Walker factually innocent
7  of the charges, vacated his conviction, and granted his petition for writ of habeas corpus.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* In *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, the Ninth Circuit elaborated:

> In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact.
>
> If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.

210 F.3d 1099, 1102-03 (9th Cir. 2000) (citations omitted). In a motion for summary judgment, the court draws all reasonable inferences that may be taken from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 does not confer an independent substantive right, but provides a method for vindicating federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a claim under § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation was committed by a person acting under the color of State law. *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

Here, Walker points to two bases for his § 1983 claims. First, he contends that his constitutional rights to due process under the Fourteenth Amendment were violated by the deliberate fabrication of false evidence by the government in connection with the interviews of Bowers, Dunbar, and Miller. Second, he asserts that his constitutional right to due process under the Fourteenth Amendment was violated by the deliberate suppression by the government of the "blood letter" and the circumstances surrounding Bowers's refusal to take a second polygraph (*Brady* violations).

**B.     Section 1983 Claim Based on Fabrication of Evidence**

Defendants first move for summary judgment of any constitutional violation based on their alleged manipulations of Bowers, Dunbar, and Miller in interviews. Plaintiffs essentially claim that defendants deliberately fabricated false evidence through manipulative interview techniques used with these witnesses. Plaintiffs have a "'clearly established' due process right not to be subjected to criminal charges on the basis of deliberately fabricated false evidence by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*). The parties first dispute the applicable standard. Defendants contend that under *Devereaux* plaintiffs are required to show either that the deputies "(1) continued the investigation although they knew or should have known of [Walker's] innocence, or (2) used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076. Plaintiffs argue that the standard relied upon by defendants was limited by *Devereaux* to police interviews of child witnesses in child molestation cases. The proper standard, according to

plaintiffs, is whether there is a genuine factual question as to whether the deputies acted deliberately to produce fabricated evidence against Walker. *See* Opp'n at 22:2-6. The court disagrees. Courts have applied the two prong *Devereaux* test in other than child molestation cases. *See Tennison v. City and County of San Francisco*, 2006 WL 733470, *24 (N.D. Cal. 2006); *Milstein v. Cooley*, 208 F. Supp. 2d 1116, 1122 (C.D. Cal. 2002).

Here, plaintiffs do not appear to argue that the officers continued their investigation although they knew or should have known of Walker's innocence. As the evidence shows, at the time, the police were unable to eliminate Walker as a suspect based on the DNA evidence and, although no physical evidence linked Walker to the crime, Walker had an admittedly tumultuous relationship with Hopewell. Although Walker denied any involvement, he had also failed a polygraph test. Therefore, the evidence does not support a reasonable inference that the police knew or should have known of Walker's innocence at the time. Notably, plaintiffs have not demonstrated that the facts that served as the basis for the subsequent vacating of Walker's conviction were known to the deputies at the time of the investigation and trial. Thus, plaintiffs' arguments implicate only the second *Devereaux* prong.

### 1. Bowers Interview

Plaintiffs contend that there are genuine issues of material facts as to whether the investigative techniques employed by the deputies during the multiple interviews of Bowers were so coercive and abusive that they knew or should have known that they would yield false information. Specifically, plaintiffs contend that Egge focused his questions on Walker and suggested to Bowers that Walker had threatened Hopewell in the past, Egge continually focused on Walker even after Bowers responded that he had not heard of Walker's purported threats, Egge told Bowers this was likely a capital case, and Egge first suggested to Bowers the possibility that Bowers was forced to participate by someone else, possibly Walker. Plaintiffs also take issue with the several times during which the interview was not taped because the recorder purportedly was not working.

Relying upon *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003), defendants first argue that suggesting Walker as a possible accomplice or primary aggressor is an acceptable interview tactic. The *Gausvik* court noted, "[s]uggestive interview tactics alone do not amount to a constitutional

violation." *Id.*; *see also Devereaux*, 263 F.3d at 1075 (There is no constitutional right to have witnesses interviewed in a particular manner or to have the investigation carried on in a particular way.). In *Gausvik*, the plaintiff argued that the defendant improperly falsified evidence by stating in an affidavit that certain individuals tested "positive" for abuse when the children's tests were only suggestive or consistent with sexual abuse. 345 F.3d at 817. The court held that the affiant's conduct did not constitute use of investigative techniques that he knew would yield false information, but rather was mere careless or inaccurate representation of the facts. The court also found that there were no "overbearing" interview techniques employed when the officer continued to question the child witnesses after their initial denials. *Id.* Here, Egge did not say anything that was untrue to Bowers. What Egge did, at most, was to suggest to Bowers that Walker was involved. *See id.* "[S]uggestive interview tactics" do not amount to a constitutional violation.

Egge first interviewed Bowers on March 7, 1991. Pennington Aff., Ex. F (Bowers Interview-Tape I) at 1. Plaintiffs note that the recorder did not work until thirty minutes into the interview. *Id.* In addition, plaintiffs argue that Bowers never implicated Walker until Egge mentioned Walker's name several times. According to the interview transcript, Bowers appeared to initially suggest that perhaps Goforth had something to do with the homicide. *Id.* at 8-9. Egge's line of questioning remained focused on Walker, asking whether Bowers had heard that Walker "got burned" by Hopewell for an auto theft and that Walker made "threats" to get even with Hopewell. *Id.* at 10-11. Some time into the interview, Egge informed Bowers why he was under arrest for the murder. *Id.* at 18. He informed Bowers that they had matched Bowers's fingerprints to the duct tape that was wrapped around Hopewell, with prints on a sufficient length of tape that definitely placed Bowers at the scene. *Id.* at 19, 21. He further suggested that he felt Bowers was a part of the murder, but that there's probably more than one person involved because there was no sign of a struggle. *Id.* at 20. Specifically, he stated to Bowers:

> But I don't think you were the only one. I don't know if Ricky was there, you know. Uh, 'cause he's pissed off at her. Um, I don't know what to tell you other than, you know, I'm just tellin' you the truth of what was found in the evidence, okay?
>
> \*\*\*
>
> And to me, and I'm sure it is to the District Attorney, just to that in itself, I think, is

> enough to prosecute you. But I don't really know what your full involvement was. Uh, I don't know if you were with somebody else that was forcin' you to help or do something or – 'cause there's no way . . . I mean, there's no way you're gonna be able to convince me that you weren't there.

*Id.* at 24, 26. Plaintiffs also note that Egge told Bowers the crime would probably be charged as a capital case for torture. *Id.* at 31. Egge then ended the interview.

Bowers was again interviewed that morning, apparently by Gail Lewis, another deputy. Again, a portion of the interview was not recorded, purportedly due to a problem with the recorder. The transcript thus begins in the middle of what appears to be a confession by Bowers. Pennington Aff., Ex. G at 1. Bowers implicated two "white dudes," whom he suggested were Goforth's employees, and Walker as the main perpetrators, and said that he was forced to assist with the duct tape. *Id.* at 1-3, 6. Lewis's questioning was limited to telling Bowers she believed him and agreeing with his statements. *Id.* at 1-4. Lewis then suggested that Egge be brought back into the interview room, stating "[w]e can get this included on one. [Egge] goes in front of the D.A. and he sees what's going on here, how you got, basically, suckered into this. And basically feared for your life if you didn't." *Id.* at 3-4.[3] At one point Bowers also questioned whether the tapes were rolling. *Id.* at 4. Lewis responded by asking whether he wanted the tapes rolling, to which Bowers replied "no." *Id.* It is unclear whether there was then another break in the recording. However, Egge's questioning suggesting Walker's possible involvement appears to have been fully recorded.

Thus, here, viewing the evidence in the light most favorable to plaintiffs, Egge's interview techniques do not fall within the second prong in *Devereaux*. Egge appears to have done nothing more than aggressively suggest Walker may have been involved, which does not amount to a constitutional violation. *See Gausvik*, 345 F.3d at 817. Although Egge provided Bowers with information about accounts of Walker's violent behavior, including toward Hopewell, provided Bowers with the possible scenario that another person—maybe Walker—was the primary aggressor who forced Bowers to participate, and suggested that the district attorney would look favorably upon his cooperation and the fact that he was coerced to participate, Egge cannot be said to have thereby

---

[3] There appears to be a break in the recording when the tape was switched to side B. *See* Pennington Aff., Ex. G (Bowers Interview-Tape II) at 4.

1  deliberately caused Bowers to fabricate testimony by abusive or coercive techniques.

2  Pennington interviewed Bowers later that same day. However, plaintiffs do not point to any
3  improper techniques employed by Pennington and submit that Bowers merely reiterated his story
4  that Walker and two white men had coerced him into participating in the murder. *See* Opp'n at 5:11-
5  12. Accordingly, the court finds no basis for a § 1983 claim against Pennington based on his
6  interview of Bowers.

### 2.    Dunbar Interview

8  The parties agree that Pennington was not involved in the Dunbar interview at issue;
9  accordingly, there is no basis for a § 1983 claim against Pennington based on the Dunbar interview.

10  Egge accompanied district attorney Schon to interview Dunbar in July of 1991. Defendants
11  argue that neither Egge nor Schon believed that Dunbar was exhibiting signs of withdrawal during
12  the interview and, even if she did, statements made by a person in the throes of withdrawal may be
13  considered voluntary. *See United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992) (concluding
14  that despite statements were voluntary because despite being in heroin withdrawal, defendant
15  "remained coherent and responsive, was aware of what was going on") (overruled on other grounds
16  in *United States v. Kim*, 105 F.3d 1579, 1581 (9th Cir. 1997)).

17  Plaintiffs submit that the issue is not whether Dunbar's statements were voluntary because of
18  her withdrawal, but whether Egge and Schon manipulated and pressured Dunbar into lying about
19  Walker in exchange for release from custody. Plaintiffs submit that because it was obvious Dunbar
20  was exhibiting signs of drug withdrawal and was motivated to get out of jail and obtain her next
21  "hit," Egge and Schon manipulated her to lie by suggesting they could help her get released.

22  The court agrees that the evidence plaintiffs point to, when viewed in the light most
23  favorable to plaintiffs, give rise to a genuine issue whether Egge and Schon knew or should have
24  known that their interview techniques could elicit false testimony from Dunbar. *See e.g.*,
25  Pennington Aff., Ex. Q (Dunbar Interview) at 47, 49 ("But see, it's like, I just, I just want to be out of
26  custody ASAP. . . . You know, I just need, I want to be out of custody, like, now."); *Id.* at 45-46
27  (Egge: "Well, let's put it this way. The longer you can keep Ricky in jail . . . ." Dunbar: "All, this is
28  what I want. Okay, and I will quote unquote in writing, or whatever, testify against Quedellis

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS EARL PENNINGTON'S AND GERALD EGGE'S
MOTION FOR SUMMARY JUDGMENT—C-04-02211 RMW
SPT                                                              11

Ricardo Walker, okay, but only if I'm taken out of here."). The day following Dunbar's testimony at the preliminary hearing, assistant district attorney of the homicide team, Dave Davies, requested a special OR hearing. That day, Dunbar was released on her own recognizance to care for her children. Decl. of Matthew Davis Supp. Pls.' Opp'n ("Davis Decl."), Ex. 12 at 1; Ex. 15 at 61:12-62:24.

Defendants also argue that Egge did not induce Dunbar to testify falsely. In particular, defendants argue that "J.D." had made a statement to the effect that Walker had a violent history with Hopewell, Harris Aff., Ex. G (Pennington Depo.) at 47:5-6, and Walker himself had admitted that he had fought with Hopewell and had threatened to kill her, Pennington Aff., Ex. L (Walker Interview) at 1716-17. In addition, Dunbar testified that she had given Walker Isotoner gloves, a true fact to which Walker had already admitted. Defendants thus argue that no false testimony was induced from Dunbar.

Plaintiffs do not point to any particular testimony by Dunbar that was false. Even if the evidence supports an inference that Egge and Schon manipulated Dunbar and attempted to offer her release or leniency when she was desperate to be released, plaintiffs have not offered any evidence that such conduct resulted in fabricated or false testimony. Because Walker's asserted violation of due process rests on the contention that Walker was subjected to criminal charges on the basis of deliberately fabricated evidence by the government, Walker has failed to point to evidence that would support an essential element of his claim—that the Dunbar interview resulted in deliberately fabricated or false evidence. Accordingly, summary judgment for defendant Egge is warranted as to the Dunbar interview.[4]

### 3. Miller Interview

Pennington and Egge interviewed Miller after Walker named her as his alibi. Plaintiffs do

---

[4] Egge also argues that he is subject to absolute immunity because he was acting in a prosecutorial function during the Dunbar interview. He points to the same arguments made in defendant Schon's motion for summary judgment based on absolute immunity. The court's March 19, 2007 held that Schon was not entitled to absolute immunity as to the Dunbar interview. The court does not reach this issue as to Egge based on the conclusion that plaintiffs have failed to point to evidence supporting an inference that Dunbar presented false testimony as a result of any conduct by Egge during the Dunbar interview.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS EARL PENNINGTON'S AND GERALD EGGE'S MOTION FOR SUMMARY JUDGMENT—C-04-02211 RMW
SPT                                     12

1  not provide any substantive argument in their opposing brief.  According to plaintiffs' responses to
2  interrogatories, Pennington and Egge knew that Miller would be reluctant to serve as Walker's alibi
3  because she would have to disclose publicly that she had a sexual liaison with Walker and spent
4  several days with him using drugs in a hotel.  Plaintiffs also submit that Pennington and Egge
5  improperly approached Miller's husband first and failed to first inform her that Walker had named
6  her as an alibi in a murder investigation.  However, "[t]here is no constitutional right to have
7  witnesses interviewed in a particular manner or to have the investigation carried on in a particular
8  way."  *Devereaux*, 263 F.3d at 1075.  Moreover, Miller testified in deposition that her responses to
9  the officers' questions were the subject of her own free will.  Harris Aff., Ex. J (Miller Depo.) at 18:
10 20-25.  Even after she was told that Walker had named her as his alibi, she maintained her story.
11 Although she later changed her story during the preliminary hearing and again during her trial
12 testimony, there is no evidence to show that either Pennington or Egge did anything to cause her to
13 later change her story.  Accordingly, the court grants defendants' motion for summary judgment as
14 to the Miller interview.

15       **C.**      **Section 1983 Violation Based on *Brady* Claims**
16             **1.**      ***Brady* Violation**

17 Walker also asserts a § 1983 violation based on *Brady* claims.  Under *Brady v. Maryland*,
18 373 U.S. 83, 87 (1963), the government's failure to disclose material evidence favorable to the
19 accused can violate the accused's due process right to a fair trial.  *See also Kyles v. Whitley*, 514 U.S.
20 419, 433-34 (1995); *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) ("the [*Brady*] rule
21 encompasses evidence 'known only to police investigators and not to the prosecutor'") (quoting
22 *Kyles*, 514 U.S. at 438); *United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004) (noting that the
23 obligation extends to the government actors, not just the prosecutor).  To establish a *Brady* claim,
24 the accused must establish that the government (1) suppressed evidence in his criminal trial, (2) the
25 evidence would have been favorable to his criminal trial, and (3) the evidence is material in that
26 there is a reasonable probability that the disclosure would have produced a different result at the
27 criminal trial.  *Strickler*, 527 U.S. at 281-82.  A *Brady* claim may be stated whether or not the
28 government acted willfully.  *Id.*  A valid *Brady* claim results in a new trial on guilt or punishment (or

both) for the accused.  *See, e.g., id.* at 266; *Brady*, 373 U.S. at 87-88; *United States v. Endicott*, 869 F.2d 452, 454-55 (9th Cir. 1989).

Walker's *Brady* claims are premised on the government's failure to disclose (1) the Bowers "blood letter" and (2) the circumstances of Bowers's refusal to take a second polygraph after he changed his confession.  Applying the *Brady* elements set forth in *Strickler*, Walker has asserted *Brady* claims.  First, the parties do not dispute that, at the time of the trial, the government did not disclose the Bowers letter or that Bowers had refused to take a second polygraph to the defense.  Bowers testified against Walker at trial; thus, evidence tending to discredit Bowers or that could be used to impeach his testimony would have been favorable to Walker.  Finally, there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed.  There was no physical evidence linking Walker to the crime.  Bowers's accomplice testimony and his credibility were of substantial significance to the outcome of Walker's trial.  At trial, the prosecution argued before the jury that Bowers "bared his soul to you.  He came in here and I submit was very, very credible."  Davis Decl., Ex. 3 (Trial Tr.) at 3661:28-3662:3.  The prosecution admitted they needed Bowers's testimony to secure Walker's conviction.  *See id.* at 3649:19-21 ("We needed [Bowers's] testimony to present to you, ladies and gentlemen, to convince you of Mr. Walker's guilt").  Thus, Walker has asserted two *Brady* violations.

**2.  § 1983 Claim**

The existence of a *Brady* violation does not automatically give rise to a § 1983 claim.  *See Tennison*, 2006 WL 733470 at *28.  Rather, to establish a civil rights claim some level of culpability is required.  *Id.*  However, the Ninth Circuit has not yet ruled on the culpability showing required to establish a § 1983 claim based on a *Brady* violation.  *Id.* at *29.  Defendants argue that a showing of bad faith is required.  In *McMillan v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996), the Eleventh Circuit concluded that investigators have a duty to disclose irrespective of good or bad faith.  More recently, in *Porter v. White*, ___ F.3d ___, 2007 WL 1074714, *11 (11th Cir. April 12, 2007) (certified for publication), the Eleventh Circuit concluded that "a negligent act or omission cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation."  There must be "some evidence of more-than-negligent conduct."  *Id.* at *12.  In

contrast, the Fourth Circuit has affirmed, by a divided *en banc* court, a district court's dismissal of a complaint after holding that the plaintiff must show bad faith to hold police officers liable. *See Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (*en banc*). Similarly, in *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004), the Eighth Circuit concluded that as to police officers, a § 1983 plaintiff must make a showing of bad faith. In doing so, the Eighth Circuit extended the holding in *Youngblood v. Arizona*, 488 U.S. 51, 57 (1988) that "[a] due process violation based on the failure to *preserve* potentially exculpatory evidence requires a showing of bad faith on the part of the official." *Villasana*, 368 F.3d at 980 (emphasis added).

In *Tennison*, the district court distinguished *Youngblood* from a claim arising out of a failure to turn over existing material evidence, pointing out that in the criminal context, a failure to preserve claim requires a showing of bad faith whereas a *Brady* claim does not. Therefore, reliance on *Youngblood* is inappropriate. The court further reasoned that although under *Daniels v. Williams*, 474 U.S. 327, 328 (1986), "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property," the Court did not require a bad faith standard in order to establish a due process violation. (emphasis in original). Because the court finds the reasoning in *Tennison* persuasive, it agrees that the bad faith requirement in *Youngblood* does not apply to Walker's § 1983 claims based on the asserted *Brady* violations of failing to disclose material evidence. The court also concludes, however, that mere negligence is not sufficient to establish a § 1983 claim based on a *Brady* violation. What appears to be required is a showing that defendants deliberately withheld exculpatory evidence. *See Tennison*, 2006 WL 733470 at *29.

Applying the standard here, the court concludes that the evidence in the record supports a reasonable inference that the government acted deliberately, not merely negligently, in failing to disclose the Bowers letter and the circumstances of Bowers's initial willingness and subsequent refusal to submit to a second polygraph after he revised his confession. Defendants argue that the failure to disclose the lack of a second polygraph cannot be the basis of a *Brady* claim or a § 1983 claim because defense knew or should have known that no second polygraph was administered, particularly because the prosecution argued during trial that Bowers initially failed a polygraph and

1  then "'fessed up." There is no *Brady* violation if the accused knew of the purportedly withheld facts
2  during the criminal trial. *See Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). However, the
3  issue here is not whether Walker's counsel knew that no second polygraph was administered. At
4  issue is that the government failed to disclose that Bowers *refused* to take a second polygraph. *See*
5  Davis Decl., Ex. 4 (Egge Depo.) at 71:8-10; Ex. 7 (Pennington Depo.) at 86:15-22. This particular
6  fact is material to Bowers's credibility and the credibility of his revised confession, to which he
7  testified at trial. However, Egge made no written report regarding either the request for a second
8  polygraph or Bowers's refusal to submit to the polygraph. *Id.*, Ex. 4 (Egge Depo.) at 71:11-21.
9  Moreover, he did not inform anyone else, including the district attorney's office, of Bowers's refusal.
10 *Id.* at 72:7-21. There was no record of the failed attempt to administer a second polygraph after
11 Bowers changed his confession even though it is the usual practice to document a refusal of a
12 polygraph and to record conversation with a suspect during which he refuses to take a polygraph.
13 *Id.*, Ex. 7 (Pennington Depo.) at 86:6-8; 86:25-87:2.
14      Defendants also argue that a *Brady* violation may not be premised on the failure to disclose
15 Bowers's "blood letter" because Egge did not suppress the letter but acted in good faith in either
16 bringing the letter to the Sheriff's department to be placed in the Hopewell file or having filed it
17 there himself. Although this may be a reasonable inference from the evidence, it is not the only
18 reasonable inference. In his deposition Egge testified that he did not think the letter was the type of
19 information that should be given to the district attorney. Davis Decl., Ex. 4 (Egge Depo.) at 29:7-
20 30:6. The facts show that Egge received the letter just days before the trial started. Harris Aff., Ex.
21 K. Defendants concede that this letter never reached Pennington or Schon, both of whom were at
22 the Hopewell trial. *See* Defs.' Mot. Summ. J. at 2:1-2. At the time he received the letter, Egge had
23 already been transferred to court services. Egge did not inform Pennington, the prosecution, or the
24 defense of the letter because he viewed it as having no evidentiary significance. *Id.* at 29:7-30:21;
25 *see also* Harris Aff., Ex. A (Egge Depo.) at 18:24-20:7. Viewing the totality of these facts in the
26 light most favorable to plaintiffs, a reasonable inference may be made that Egge placed the letter in
27 the file and failed to inform others about the letter with some intent to keep it from the prosecution
28 or defense. Notably, defendants do not dispute that any evidence should be turned over to the

prosecution—not just evidence they find material.  Whether the material has evidentiary value is for the prosecutor to decide.  *See Kyles*, 514 U.S. at 437-38 (noting that it is the prosecution's duty to learn of any exculpatory evidence known to others acting on the government's behalf).  Moreover, the letter was received just days before trial so it would be reasonable to infer that the prosecution would not be going back to the case file to see if anything had been added.

### 3. Qualified Immunity

Defendants argue that even if a § 1983 claim can be established based on the asserted *Brady* violations, summary judgment is warranted on the basis of qualified immunity.  In determining whether the government officials are entitled to qualified immunity, the court first considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (U.S. 2001).  If this threshold showing cannot be made, the inquiry ends.  *Id.*  If the threshold showing is met, the court then considers whether the right is clearly established.  *Id.*  A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*

Here, defendants specifically argue that plaintiffs have not established the second prong in *Saucier*—that, in 1991, *Brady* gave rise to an independent constitutional violation by law enforcement officers who withhold from prosecutors evidence acquired during the course of investigations.  This argument is without merit.  *See United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) ("Since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure."); *Endicott*, 869 F.2d at 456 (the knowledge of the withheld evidence by some government agents can be imputed to the prosecutors).  Accordingly, summary judgment is not warranted on Egge and Pennington's motion for summary judgment as to Walker's § 1983 claims based on the asserted *Brady* violations.

### D. Section 1985 Claim

Defendants also move for summary judgment on Walker's § 1985 claim that defendants conspired to violate his constitutional rights in violation of 42 U.S.C. § 1985.  Walker must establish (1) a conspiracy to deprive the plaintiff of equal protection of the laws, (2) an act in furtherance of

1  the conspiracy, and (3) a resulting injury.  Here, Walker contends that there was a conspiracy solely
2  on the basis that "Egge and Pennington conduct[ed] joint interrogations, plan[ned] tactics and
3  strategy together, and [worked] as a two-person team."  The court does not find this sufficient to
4  withstand summary judgment on the § 1985 claim.  Walker fails to point to any specific facts
5  tending to show a conspiracy.  At best, his argument is consistent with the fact that Egge and
6  Pennington were both assigned to the investigation.  Moreover, as discussed in section E, *infra*, the
7  record does not support a showing that defendants' decision to accept Bowers's revised confession
8  omitting the involvement of two white men and implicating only another African American
9  (Walker) constitutes a violation of the Equal Protection Clause.

  **E.**  **Equal Protection Clause**

Defendants also move for summary judgment as to Walker's Equal Protection Clause claim.  Walker argues that defendants accepted Bowers's revised confession that two African American men—Bowers and Walker—participated in the murder over the initial confession that further involved two white men in addition to Bowers and Walker without providing a "race neutral" explanation.  Defendants are entitled to summary judgment on this claim as plaintiffs provide no evidence that the defendants' decision was based on or motivated by race.  Rather, the record shows that defendants rejected the initial story because Bowers failed a polygraph and then wanted to revise his confession.  Moreover, there is non-race-based evidence in the record that could reasonably support the decision to accept Bowers's second confession.  For example, Walker had admitted to a violent relationship with Hopewell, Walker's alibi could not be supported at the time, and although Walker denied any involvement, he had failed his polygraph.

  **F.**  **Claims by Myrtle and William Walker**

Defendants' motion for summary judgment as to Myrtle and William Walker's claims is granted as unopposed.

  **G.**  **State Law Claims**

Defendants' motion for summary judgment as to plaintiffs' state law claims is granted as unopposed.


## III.  ORDER

For the foregoing reasons, the court GRANTS in part and DENIES in part defendants' motion for summary judgment as follows:

1. Pennington's motion for summary judgment is DENIED as to Walker's § 1983 claim based on the alleged suppression of facts relating to Bowers's refusal to take a second polygraph and GRANTED as to Walker's remaining § 1983 claims against Pennington;

2. Egge's motion for summary judgment is DENIED as to Walker's § 1983 claim predicated upon the alleged suppression of Bowers's letter to Egge and on the alleged suppression of facts relating to Bowers's refusal to take a second polygraph and GRANTED as to Walker's remaining § 1983 claims against Egge;

3. Pennington's and Egge's motion for summary judgment as to Walker's § 1985 claim is GRANTED;

4. Pennington's and Egge's motion for summary judgment as to Walker's Equal Protection Clause claim is GRANTED;

5. Pennington's and Egge's motion for summary judgment as to Myrtle and William Walker's claims is GRANTED; and

6. Pennington's and Egge's motion for summary judgment as to plaintiffs' state law claims is GRANTED.

DATED:     4/23/07                         _____
                                           RONALD M. WHYTE
                                           United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

| | |
|---|---|
| Matthew D. Davis | mdavis@walkuplawoffice.com |
| Erik T. Atkisson | eatkisson@reedsmith.com |
| Richard H. Schoenberger | rschoenberger@walkuplawoffice.com |

**Counsel for Defendant(s):**

| | |
|---|---|
| Aryn Paige Harris | aryn_harris@cco.co.scl.ca.us |
| Gregory J. Sebastinelli | gregory.sebastinelli@cco.co.scl.ca.us |
| My-Le Jacqueline Duong | Jacqueline.duong@cco.sccgov.org |
| Winifred Botha | winifred_botha@mail.cco.co.santa-clara.ca.us |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** 4/23/07                             SPT
                                               **Chambers of Judge Whyte**